IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WECKER V. BRANTING

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GARY E. WECKER, APPELLEE,

V.

JAIMIE L. BRANTING, APPELLANT.

Filed February 25, 2020.    No. A-19-296.

Appeal from the District Court for Madison County: JAMES G. KUBE, Judge. Affirmed in part, and in part reversed and remanded with directions.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, for appellant.

Sharon E. Joseph, of Joseph Law Office, for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jaimie L. Branting appeals from the order of the Madison County District Court establishing custody, parenting time, and child support in this paternity case. For the reasons set forth herein, we affirm in part, and in part reverse and remand with directions.

## II. STATEMENT OF FACTS

In November 2015, Branting gave birth to Colby J. Wecker. Branting and Gary E. Wecker signed an acknowledgement of paternity the day after Colby's birth and 2016 DNA testing established a 99.99998 percent probability that Wecker was Colby's father.

At the time of Colby's birth, Branting and Wecker lived together in Norfolk and worked for the same employer. After Wecker and Branting ceased cohabitating, Wecker stated that the

parties split parenting time with Wecker's parenting time based upon his work schedule. Wecker testified this arrangement worked initially, but as time went on, Branting started arriving late to their drop-offs, she would not have Colby dressed appropriately for the weather, and she started telling Wecker that "she wasn't going to bring Colby to [him], she was just going to keep him."

In January 2017, Wecker filed a complaint for the establishment of paternity, custody, child support, and other related matters after Branting started withholding Colby from his agreed-upon parenting time. In May, the district court entered a temporary order granting the parties joint legal and physical custody of Colby with parenting time for each party incorporating Wecker's work schedule. Additionally, the court ordered Wecker to pay $50 per month in temporary child support. This order was later amended to increase Wecker's temporary child support obligation. Trial in this matter was held in October 2018. Witnesses at trial included Wecker; Branting; Deann Wecker, Wecker's ex-wife; Jeremy Smith, Branting's fiance; Jennifer Williams, who watches Colby on the evenings when Wecker had to work overnight shifts; and Jocelyn Boruch, Branting's mother.

Branting testified that, in July or August 2016, she and Colby moved out of Wecker's home into her parents' home in Osceola, Nebraska. After a few months, they moved in with Branting's fiancé, Jeremy Smith, but then moved back in with Branting's parents for a few months in the summer of 2017. Branting and Colby then moved back in with Smith and they had been living together since that time. In January 2018, Branting, Colby, and Smith moved into a home in Shelby, Nebraska, which they continued to occupy at the time of the October trial. Branting acknowledged that Smith owns the home and that she is not a co-owner. The home has four bedrooms, Colby has his own room, and the home has rooms for Colby's toys.

Branting testified that when she was living with Wecker, she was Colby's primary caregiver. She further testified that if Colby was sick, she, not Wecker, would stay home to care for Colby. Branting also expressed concern regarding a heart condition that Wecker had when they were together. She stated:

> When [Wecker] and I were together, this medicine that he would take . . . would slow down his heart so much that he would fall asleep and sometimes he would be asleep for five minutes, sometimes it would be two hours. And sometimes in the night he wouldn't wake up when Colby would be crying so I would get up with Colby.

When the parties met, Branting was employed at the same place as Wecker as an ethanol operator in training. Branting quit this position shortly after Colby's birth. Since that time, she has had three jobs. She was employed at one position for 1½ years, then moved on to full-time employment at a plumbing and utility company earning $12.50 per hour. She is currently employed working from home as a secretary for Smith's trucking company. Smith testified that although Branting does not receive a salary, she has access to the checkbook and credit cards to "get whatever she needs."

Wecker testified that he has been employed as an ethanol operator for the past 6 years, has been living in his home for 2 years, and has lived in Norfolk for 40 years. Wecker testified that his health coverage for just himself was $110 per month and with Colby, the health coverage expense increased to $313 per month. Wecker provided further information regarding health, dental, and

vision expenses which were received into evidence in exhibit 19 and which will be discussed in more detail in the analysis section of this opinion.

Wecker testified that Branting had conversations with him about Smith and that Smith was abusive and had a drinking problem. When Branting arrived to an exchange with a black eye she stated that "the guy that she lived with had hit her" and Wecker testified that it was clear that she was referring to Smith. Branting testified that there are no domestic violence issues between herself and Smith and that she lied when she told Wecker that there was. Branting also admitted telling Wecker that she was moving out of Smith's home "quite a few times" but she did not actually do so. She also told Wecker that she was going to move in with someone named "Mike" but she did not do so.

Both parties expressed concerns with the parenting of the other party. Wecker expressed concerns with Branting's failure to dress Colby appropriately for the weather; driving Colby without a car seat; bringing Colby to parenting exchanges in pants soaked with urine and feces; and Colby arriving for visits with bruises, burns, and "bad rashes." Williams also testified that it is "very common" for Colby to have injuries, such as burns and scrapes, when he returns from Branting's home. Branting testified that Colby returned from visits with Wecker with diaper rash which she treated with Desitin or baby powder. She also complained of one instance where Wecker had changed one of Colby's doctor's appointments without her knowledge, but Wecker testified that he only rescheduled the appointment after Branting had missed Colby's medical appointment to have his heart murmur checked and to have his immunizations, so he rescheduled, and took Colby to that appointment.

Wecker testified to two specific incidents in which Colby was returned from visits with Branting with sores on his tongue and where Colby was injured by a 55-gallon drum which resulted in injuries to Colby's right eye. In response, Branting acknowledged not taking Colby to the doctor for the sores, instead choosing to stop giving Colby "Sunny D" and switching him to milk and water. As to the injuries caused by the 55-gallon drum, which caused scratches and swelling underneath Colby's right eye, Branting testified that "[h]e was helping me clean the shop at our house and there was a 55-gallon drum and he was rolling it along on the floor, and he tumbled over the top of it and basically face-planted into the concrete." Branting stated that she believes in taking children to the doctor "if it's something serious enough." Branting further admitted that after Colby touched a wood burning stove while under her supervision, Colby developed a burn with blistering open sores which Branting treated with Neosporin and decided to forgo taking him to the doctor despite the fact that she was aware that there was a possibility for infection. She stated that on the occasion when she returned Colby to Wecker with either a wet or poopy diaper, they had either been at the river or the pool and she had forgotten the diaper bag with extra pull-ups and baby wipes. She testified that she informed Wecker of the accident and that she had forgotten the diaper bag at home, so she was unable to change Colby at the exchange location.

The parties testified extensively regarding a disagreement concerning parenting time which involved a snowstorm on January 22, 2018. Specifically, during Wecker's parenting time with Colby, Branting learned of warnings of an impending snowstorm. In response, Branting corresponded with Wecker, inquiring if Wecker would return Colby a day early due to the impending snowstorm, but Wecker refused. Wecker was then unable to return Colby to Branting on time the following day due to hazardous road conditions which had closed roads, but he returned

Colby the next day after roads were open. Following that incident, Wecker testified that Branting would state that she was not going to return Colby "because it's snowing out." On another occasion, Branting told Wecker that she would not bring Colby because he was sick. One of the texts to Wecker stated "[Colby]'s been puking. I am not going to run him around when he's sick. You got him an extra day last week anyways." However, Wecker testified that once Branting brought Colby to the exchange, Colby was not sick.

Wecker also testified that Branting was 20 minutes late to an exchange in July 2018 so he texted her to ask if she would be there soon, to which she replied that she was taking her 10 days of summer time with Colby so she would not be bringing him. He responded that she was supposed to provide him with 30 days' notice but Branting stated that her "daughter will be coming back and we have plans so [Colby] will stay with me and I will keep him for my ten days." Branting admitted that she did not give Wecker 30 days' notice for her 10 days of 2018 summer visitation. She stated that her daughter was originally scheduled to return in August, but the daughter's plans changed at the last minute and she came home in July. Since Branting is only able to see her daughter once per year, she notified Wecker immediately when she became aware of the changed plans. However, she also decided to keep Colby the extra day between the end of her visit and the start of her 10-day summer visitation. She further admitted that she has unilaterally decided that at certain times, she did not want Wecker to have Colby, and that Wecker was not going to pick up Colby. She further admitted that Wecker had not done the same thing to her.

Both parties admitted to previous legal troubles. Wecker admitted that due to an incident in May 2010 involving his older son with his ex-wife, he was convicted of child neglect. The court's findings and order, which were received into evidence, found that Wecker had used methamphetamine during the time when his minor child was in his custody. He stated his use of substances contributed to the conviction and the conviction has since been set aside. Further, he testified that he no longer uses substances because "it's just a bunch of trouble." Branting admitted that she has been convicted of driving under the influence in 2010 and that in 2017, she received a citation for driving under suspension while her license was temporarily suspended and that she had still been driving Colby.

Wecker acknowledged that he had to work nights four times per month during his parenting time with Colby. In order to accommodate his work schedule, Wecker testified that Jennifer Williams had agreed to stay overnight at Wecker's home to care for Colby in Wecker's absence. Williams corroborated Wecker's testimony stating that she helps Wecker on about four nights per month when Wecker works by spending the night at Wecker's home by taking care of Colby and by taking Colby to school. Additionally, Wecker testified that he had applied to move to the day shift in the beginning of 2018 and was scheduled to begin the day shift in mid-2018. He also testified that his support system included Williams and family that lived close by. Wecker also testified that he had looked at the Northern Hills Daycare and Preschool which had an opening for Colby and had an added benefit in that it would transport older children to school. However, Wecker acknowledged he had not paid a deposit to reserve a place for Colby. Branting testified that she had signed Colby up for a preschool waiting list for the following year.

Deann Wecker, Wecker's ex-wife and the mother of their 13-year-old son, testified that after the 2010 incident, she had not seen any indication that Wecker was using illegal substances nor had she seen Wecker inebriated while he was taking care of their son or Colby, and she had no

concerns about her son being with Wecker. She further testified that she and Wecker split their time with their son roughly "50/50," their communication is "great," and he is involved with decisions involving their son. Deann also testified that Wecker's care for the children is "excellent," and he is "a good dad." Williams likewise testified that she had not seen anything inappropriate regarding Wecker and his children and that Wecker and Colby read together, watch TV, and play outside on their swing set and trampoline.

Branting testified that it was in Colby's best interests to be placed in her custody because she has been taking care of him most of his life and "[b]ecause [Wecker] has shown no effort to look into schools or daycare or anything educational-wise. And with his work schedule, my son would be with how many different people instead of with his own father if he were granted full custody." However, Branting admitted that Smith owns the home that she lives in and he is her employer; consequently, if she and Smith were to break up, she would not only lose the relationship, but her home and her job.

Branting testified that family activities include camping, four-wheeling, going to the river, and going to the zoo. She also stated that Colby likes to play with his cousins and other neighbor children. She further testified that Smith is "great" around Colby and that she has family and friends who can help with Colby if she needs assistance. Smith testified that Branting does most of the cooking, cleaning, caring for, and supervising Colby, but that he interacts with Colby every day. Branting's mother, Jocelyn Boruch, testified that Branting is a "wonderful mother" who

> [s]pends every waking moment she has with Colby and she holds him until he falls asleep every night. They snuggle. . . . Colby loves to play outside and she plays outside with him. And he loves being on the farm with the animals and . . . he's just a very active little boy right now. He loves trucks and all the things little boys do and loves to build and fix things.

In its order, the district court found that Wecker was Colby's natural and biological father. The court granted the parties joint legal custody of Colby and granted Wecker sole physical custody of Colby subject to Branting's parenting time as set forth in the visitation order which was attached to the court's order. The court noted that "[t]he evidence is replete with instances, documented by photographs and text messages between the parties, when the child sustained various injuries and health care concerns while in [Branting]'s custody." The court further found:

> The child has a heart murmur condition, which was evidently diagnosed after the child was born. [Branting] had set up an appointment with the child's physician to not only follow up on the heart murmur, but also to give the child his age-appropriate vaccinations. However, [Branting] apparently no showed to the appointment and failed to reschedule for another appointment. [Wecker] rescheduled the appointment for the child to be seen for these concerns. [Branting] characterizes this incident as [Wecker] butting in and rescheduling the appointment on his own as if he was usurping her authority. The Court does not agree with this characterization.

The court went on to list various concerns that Wecker had regarding Colby when he returned after spending time with Branting, including a burn on the back of the child's index finger in February 2017; sores in the child's mouth and tongue in March 2018; a swollen and discolored left eye in May 2018; a cough, rash on his eye, and exhaustion in May 2018; scrapes on Colby's

body and another rash in May 2018; a scratch under Colby's right eye in May 2018; severe, untreated diaper rash in July 2018; more scratches under Colby's right eye that swelled up the following day, which injury was caused by Colby playing with a 55-gallon drum while in Branting's care in August 2018; and Colby being soaked with urine upon being returned to Wecker's care in October 2018. The court noted that it was "concerned with the number and frequency of injuries to Colby" and that "these incidents indicate a lack of appropriate supervision of the child which causes the Court concern." The court also expressed concern for Branting's living conditions, noting that she has changed residences three times and currently lives with her boyfriend. The court noted that although Wecker testified that Branting had stated Smith had assaulted her, she then testified that she had lied. The court found that Branting's "credibility regarding her relationship, the violence which has been exercised against her, and the number and reason for her change in residences, is questionable." Further, the court noted that "[s]hould [Branting] be assaulted in the future, and for whatever reason, decides to change residences again, it is unclear where she would move with the child."

The court further noted that Wecker had

a past conviction for negligent child abuse stemming from Wecker's use of illegal drugs in the presence of his minor child from another relationship. However, [Wecker] has demonstrated that he has changed his life in a positive manner, wherein he no longer uses controlled substances. (Ex. 25) Testimony from Deanna Wecker, the mother of [Wecker]'s other child, testified that they now have a 50/50 physical custody arrangement and that [Wecker] now provides "excellent care" for their minor child, Noah. [Wecker] is easy to work with regarding any change of plans and [Wecker] takes Noah to the doctor and provides for all of Noah's needs, while in [Wecker]'s care.

The court noted that although Wecker's work schedule was "convoluted," Wecker

has shown that when he is at work or cannot provide adequate daycare of assistance, he has a friend who is a nurse (Jennifer Williams) who is more than willing to provide backup care for Colby whenever needed, including staying at [Wecker]'s home with the child, if necessary. Ms. Williams testified to this as well. [Wecker]'s work schedule is not of concern to the Court with regard to custody of this child.

The court also ordered Branting to pay $478 per month in child support. In making this determination, as set forth in its attached child support calculation worksheet, the court granted Wecker a deduction for $111 for his health insurance premium and granted him a credit of $213 for the health insurance premium for Colby.

Branting has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

On appeal, Branting contends that the district court erred (1) in awarding sole physical custody of the parties' minor child to Wecker and (2) in calculating child support including allocating excess insurance paid for the minor child.

Branting also assigns as error that the district court erred in establishing the court-ordered parenting plan. However, she did not argue this assigned error in her brief. To be considered by an

appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Schnackel v. Schnackel*, 27 Neb. App. 789, 937 N.W.2d 234 (2019).

## IV. STANDARD OF REVIEW

In a filiation proceeding, questions concerning child custody determinations are reviewed on appeal de novo on the record to determine whether there has been an abuse of discretion by the trial court, whose judgment will be upheld in the absence of an abuse of discretion. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

## V. ANALYSIS

### 1. CUSTODY

Branting first argues that the district court erred in awarding sole physical custody of Colby to Wecker.

In *State on behalf of Kaaden S. v. Jeffery T., supra*, the Nebraska Supreme Court recently restated the distinctions between legal custody and physical custody. In the instant case, the district court awarded the parties joint legal custody of Colby. Neither party has appealed that determination. Therefore, we proceed to consider Branting's argument that the district court erred in awarding sole physical custody of Colby to Wecker.

"Physical custody" is defined by the Parenting Act as "authority and responsibility regarding the child's place of residence and the exertion of continuous parenting time for significant periods of time." As such, although the Parenting Act does not speak in terms of "sole" or "primary" physical custody, it contemplates that an award of physical custody will determine the child's primary residence and identify the parent who will exert "significant" and "continuous" parenting time over the child.

*Id.* at 946, 932 N.W.2d at 703.

When custody of a minor child is an issue, child custody is determined by parental fitness and the child's best interests. See, *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007); *Spence v. Bush,* 13 Neb. App. 890, 703 N.W.2d 606 (2005) (paternity proceeding). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Maska v. Maska, supra*.

When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *State on behalf of Kaaden S. v. Jeffery T., supra*. See Neb. Rev. Stat. § 43-2923(6) (Reissue 2016).

In addition to these statutory "best interests" factors, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and

stability of each parent's character; and the parental capacity to provide physical care and to satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Here, the evidence established that both Branting and Wecker have been caring for Colby since his birth, but that Branting has unilaterally made decisions to not return Colby to Wecker for his parenting time. Further, Wecker is the more stable of the two parties having held the same employment for 6 years and lived in the same home since Colby's birth. Branting, on the other hand, has lived in three homes and held several jobs. Further, she admitted that if she ended her current relationship, she would lose her home and her job. She further told Wecker that her current situation involved domestic abuse, then stated under oath that she had lied. We find either scenario concerning.

We further note that both parties have legal matters that cause this court concern; however, Wecker has made changes to his life which are corroborated by his ex-wife Deanna who testified that he is a good father whom she trusts with their child and with whom she is able to communicate regarding issues related to their child. Alternatively, Branting has driven Colby without a car seat and, in 2017, she received a citation for driving under suspension while her license was temporarily suspended and she had still been driving Colby. We further have concerns over the numerous injuries that Colby has had when returned from Branting's care and her reluctance to take Colby for medical treatment. We find that Wecker is the parent who will provide the most stable environment for Colby and who will be the party who will foster Branting's relationship with Colby. See *Wolter v. Fortuna*, 27 Neb. App. 166, 928 N.W.2d 416 (2019) (parenting time relates to continuing and fostering normal parental relationship of noncustodial parent). For these reasons, the district court did not abuse its discretion in awarding Wecker sole physical custody of Colby.

## 2. CHILD SUPPORT

Branting next argues that the district court erred in calculating child support by including noncreditable healthcare costs in calculating creditable health insurance paid for the minor child. The district court granted Wecker a deduction for $111 for his health insurance premium cost and granted him a credit of $213 for the health insurance costs for Colby. Before addressing Branting's claim we first note an issue of plain error regarding Wecker's deduction for the parent portion of his health insurance costs.

### (a) Plain Error

Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion. *Id*.

Neb. Ct. R. § 4-205(F) (rev. 2015) provides:

Cost to the Parent for Health Insurance for Himself or Herself. A deduction shall be allowed for the monthly out-of-pocket cost to the parent for that particular parent's health insurance. This includes the cost of coverage for the parent only. It does not include the cost of health insurance for the child(ren), which is addressed in § 4-215(A). The parent requesting the

deduction must submit proof of the cost actually incurred for health insurance coverage of the parent. The amount of the deduction for the cost to the parent for health insurance for himself or herself shall not exceed 5 percent of that parent's gross income.

Our de novo review of the record reveals that the district court determined that Wecker was entitled to receive a $111 deduction for his health insurance costs. However, a post-it note attached to the medical expense printout provided as exhibit 19, made in Wecker's handwriting, indicated that his monthly expenses for his own health care costs, excluding Colby, were $55.60 for "medical," $5.60 for dental, $7.20 for vision, $.75 for "ADD," $41.67 for "FS" for total monthly expenses of $110.82. The court thus included all components of these expenses in computing this deduction. However, § 4-205(F) does not provide for a deduction for "ADD" which we surmise to mean accidental death and disability, or "FS" which we surmise to mean flexible spending payments. As such, the amount of Wecker's deduction for his parent's share of his health insurance premium should be calculated as Wecker's medical insurance premium of $55.60, his dental insurance premium of $5.60, and his vision insurance premium of $7.20, for a total health insurance deduction of $68.40. Accordingly, the district court abused its discretion in using $111 as Wecker's health insurance deduction; the total amount of Wecker's health insurance deduction is rounded down to $68.

### (b) Health Insurance Costs for Children

We now proceed to consider Branting's claim that the district court erred in allowing excess health insurance costs for Colby.

The Nebraska Child Support Guidelines, Neb. Ct. R. § 4-215(A) (rev. 2015), provides:

Health Insurance. The increased cost to the parent for health insurance for the child(ren) of the parent shall be prorated between the parents. When worksheet 1 is used, it shall be added to the monthly support from line 7, then prorated between the parents to arrive at each party's share of monthly support on line 10 of worksheet 1. The parent requesting an adjustment for health insurance premiums must submit proof of the cost for health insurance coverage of the child(ren). The parent paying the premium receives a credit against his or her share of the monthly support. If not otherwise specified in the support order, "health insurance" includes coverage for medical, dental, orthodontic, optometric, substance abuse, and mental health treatment.

Wecker testified that his health coverage for just himself was $110 per month and, with Colby, the health coverage expense increased to $313 per month. Exhibit 19 sets out that Wecker's expenses for medical insurance and prescription drug insurance coverage for himself and his children was $117.40 per month, dental insurance coverage for himself and his children was $12.60 per month, and vision insurance coverage for himself and his children was $15.60 per month. A post-it note attached to the medical expenses printout, in Wecker's handwriting, indicated that these monthly costs for himself and Colby included "ADD" of $1.47 and "FS" of $166.67. When included with these costs, Wecker's combined expenses totaled $313.35. Similar to § 4-205(F), § 4-215(A) does not provide for a deduction for accidental death and disability flexible spending payments.

To calculate Wecker's proper credit for paying Colby's health insurance, we take the total amount of health insurance premiums for Wecker and Colby and subtract the amount of the health insurance premiums attributable to Wecker alone as demonstrated in the following table:

|  | Wecker & Colby | Wecker | Cost for Colby |
|---|---|---|---|
| Health | $117.40 | $55.60 | $61.80 |
| Dental | 12.60 | 5.60 | 7.00 |
| Vision | 15.60 | 7.20 | 8.40 |
| Totals | $145.60 | $68.40 | $77.20 |

Thus, the amount of Wecker's credit for paying his children's health insurance premium is $77.20 which is rounded down to $77. Accordingly, the district court erred in granting Wecker an adjustment for the children's share of health insurance in an amount that exceeded $77.

## VI. CONCLUSION

In sum, we affirm the district court's order relating to custody, but reverse the court's child support order and remand with directions for the court to recalculate child support using Wecker's parental health insurance deduction in the amount of $68 and Wecker's credit for paying his child's share of health insurance in the amount of $77.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.